**E-FILED**
Wednesday, 19 May, 2010  10:00:20 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| ADAM O. GHYS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  09-cv-4034 |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Motion for Summary Affirmance (Doc. 13).  Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Social Security Administration denying his claim for disability benefits.  Each party has responded in opposition to the other's Motion, and they are now fully briefed and ready for disposition.  For the reasons stated below, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Motion for Summary Affirmance is granted.

### LEGAL STANDARD

To be entitled to disability benefits under the Social Security Act, a claimant must prove that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination.  *See  McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980).  The

factual determination is made by using a five-step sequential analysis.  20 C.F.R. § 404.1520; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made to determine whether the claimant is presently involved in a substantially gainful activity.   20 C.F.R. § 404.1520(b).  If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step.  At the second step, the Commissioner evaluates the severity and duration of the impairment.  20 C.F.R. § 404.1520(c).  If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; and, if the elements on the list are met or equaled, he declares the claimant eligible for benefits.  20 C.F.R. § 404.1520(d).

If the claimant does not qualify under one of the listed impairments at Step Three, the Commissioner proceeds to the fourth and fifth steps.  At the fourth step, the claimant's Residual Functional Capacity ("RFC") is evaluated to determine whether the claimant can pursue her past work.  20 C.F.R. § 404.1520(e)-(f).  If she cannot, then, at Step Five, the Commissioner evaluates the claimant's ability to perform other work available in the economy.  20 C.F.R. § 404.1520(g).

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. 405(g), which provides, in relevant part, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence,

shall be conclusive."  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Maggard*, 167 F.3d at 379 (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The claimant has the burden to prove disability through Step Four of the analysis, *i.e.*, he must demonstrate an impairment that is of sufficient severity to preclude him from pursuing his past work.  *McNeil*, 614 F.2d at 145.  However, once the claimant shows an inability to perform his past work, the burden shifts to the Commissioner, at Step Five, to show the claimant is able to engage in some other type of substantial gainful employment.  *Id*.

A court's function on review is not to try the case de novo or to supplant the decision of the Administrative Law Judge ("ALJ") with the Court's own assessment of the evidence.  *See Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989).  A court must only determine whether the ALJ's findings were supported by substantial evidence and "may not decide the facts anew, reweigh the evidence, or substitute [its] own judgment" for that of the ALJ.  *See Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986).  Furthermore, in determining whether the ALJ's findings are supported by substantial evidence, credibility determinations made by the ALJ will not be disturbed "so long as they find some support in the record and are not patently wrong."  *Herron v. Shalala*,  19 F.3d 329, 335 (7th Cir. 1994).

However, the ALJ must articulate reasons for rejecting or accepting entire lines of evidence.  *Godbey v. Apfel*, 238 F.3d 803, 807-08 (7th Cir. 2000).  The ALJ is required to "sufficiently articulate [her] assessment of the evidence to 'assure us

that [she] considered the important evidence . . . and to enable us to trace the path of [her] reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### BACKGROUND

### I.    Procedural History

Plaintiff has applied for Social Security Benefits three times prior to the current application; each of these applications was denied. (Tr. 90-93). On June 20, 2005, Plaintiff filed the current application for benefits. He alleged an onset date of September 9, 1999, though under 20 C.F.R. § 416.335, the earliest month for which he could receive benefits is July 2005. (Tr. 99-104). His application was denied initially and on reconsideration. (Tr. 35-44). On January 19, 2006, Plaintiff requested a hearing before an ALJ. (Tr. 34). ALJ Barbara Welsch held an initial hearing on July 9, 2008, and a subsequent hearing on September 15, 2008. (Tr. 213-49). The ALJ issued her opinion denying Plaintiff's application on September 22, 2008. (Tr. 7-25). On April 20, 2009, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-6). Plaintiff filed the instant appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) on May 15, 2009.

### II.   Relevant Medical History

On February 7, 2000, Christine Troxell performed a hearing evaluation on Plaintiff. In a letter reporting on this evaluation, she noted that Plaintiff had bilateral severe-to-profound sensorineural hearing loss. Plaintiff's speech reception

threshold was 60 db, and his speech discrimination scores were 88% for the right ear and 84% for the left ear. She noted that these speech discrimination scores were "very good." At that time, Plaintiff had hearing aids, and could hear at conversational levels with the aids. Ms. Troxell noted that Plaintiff communicated effectively with his hearing aids and lip reading, and that his speech was "completely intelligible." (Tr. 160-61).

On September 18, 2003, Plaintiff reported left ear pain and bleeding, for which he was prescribed an antibiotic. At this time, Plaintiff also reported a history of attention deficit hyperactivity disorder ("ADHD"), for which he had been on medication until he was 18. His girlfriend reported anger outbreaks and mood swings. He planned to be tested by a state agency regarding this. A referral to the Robert Young Center was offered, but Plaintiff declined, as he was unable to afford treatment. (Tr. 166).

Plaintiff saw Dr. Shawn Shianna on September 27, 2004 for a disability examination. At this examination, Plaintiff was wearing his right hearing aid; he typically wore one on the left ear, as well, but it was being repaired. He reported to Dr. Shianna that all hearing situations were difficult for him, and that he has constant ringing in his ears that interferes with concentration. Dr. Shianna noted that Plaintiff's speech was "very, very good. It is so good that I might not suspect a hearing loss if I was listening to this gentleman's speech in a social situation." Plaintiff "seemed a bit hard-of-hearing when [Dr. Shianna] spoke to him, though he did fairly well over all." Dr. Shianna noted that the results of testing were "a bit

worse across the board" to those obtained in 2000. He was puzzled that Plaintiff's acoustic reflex results were better than might have been expected considering Plaintiff's pure tone thresholds. Dr. Shianna found that Plaintiff had bilateral severe-to-profound hearing loss, and opined that his true thresholds might be somewhat better than testing suggested. He stated that Plaintiff would "benefit from continued bilateral hearing aid use," and that he might be a candidate for cochlear implant in the distant future. He recommended that Plaintiff's hearing be monitored yearly. (Tr. 162-65).

Dr. Francis Vincent performed an RFC evaluation of Plaintiff on October 18, 2004. Dr. Vincent found that Plaintiff had no exertional, postural, manipulative, visual, or environmental limitations. He noted that Plaintiff had the communicative limitation of limited hearing, but that his speaking was unlimited. He concluded, based on the 2004 evaluation, that Plaintiff had bilateral severe-to-profound hearing loss, with an aided average hearing threshold of 58.3 dB and 64% speech discrimination. (Tr. 199-206).

On August 3, 2005, Dr. Paul Hauck performed a mental status evaluation of Plaintiff. At the time of the evaluation, Plaintiff was wearing a hearing aid in the right ear, but that his left hearing aid was broken. After noting Plaintiff's medical history and current living situation, he proceeded to relate the results of his conversation with Plaintiff. Plaintiff reported getting frustrated with people because they didn't understand that he needed them to speak louder. Dr. Hauck stated that Plaintiff's mood, affect, speech, and thought processes were normal,

though Plaintiff noted sometimes incorrectly thinking that the phone was ringing or someone was at the door.  Plaintiff knew the day of the week, but not the date; he thought that it was July 2004.  He did know that he was in Rock Island, Illinois, his own birthday, and Dr. Hauck's profession, though not Dr. Hauck's name.  Plaintiff could recall five digits forward and three backward, but he did not know any news from the day before or the route he had travelled to the office.  The only modern president prior to Bush that he could recall was Clinton, he could only name four large cities, he could only come up with George Bush as a famous living person, and he could only list the September 11, 2001 attacks as a famous event.  Plaintiff had trouble with most simple subtraction problems and some simple addition, and could not correctly explain the meaning of two common proverbs, though he could explain the difference between a bush and a tree.  Dr. Hauck reported that Plaintiff's "judgment leaves much to be desired," and that he cannot handle his own funds.  Plaintiff could understand and follow simple orders, though he could not remember three of the orders after 10 minutes; he had problems with authority figures.  Plaintiff stated that "he would not be able to accept a job if offered tomorrow and put up with the customary pressures of a new job," though he didn't know why.  Dr. Hauck also noted that Plaintiff's sister reported that he was unable to "do anything for himself," and had to have everything explained to him.  She stated that Plaintiff was offended easily when corrected, and "will sometimes quit a job and feel uncomfortable working around others when they find fault with his work."  Dr.

Hauck did not diagnose a mental impairment, but only hearing loss, and recommended medical treatment. (Tr. 167-69).

On August 15, 2005, Plaintiff had an audiological and hearing aid evaluation by Leigh Ann Tackaberry, a clinical audiologist. She found that Plaintiff had bilateral profound sensorineural hearing loss. Plaintiff's aided speech detection threshold was 70 dB, and his aided speech discrimination threshold was 10%. However, these results were obtained using Plaintiff's old hearing aids, which Ms. Tackaberry recommended be replaced, as they were "very old and [did] not provide much benefit." (Tr. 170-72).

Dr. Boyenga Kirk performed a psychiatric review of Plaintiff on August 18, 2005, and found that he had no medically determinable mental impairment. Plaintiff had "some apparent learning problems, criminal history, and possible oppositional behavior," but not "severe enough to result in a diagnosed condition." (Tr. 185-98). This review was affirmed on December 2, 2005. (Tr. 173-74).

On September 12, 2005, Dr. Vincent performed another physical RFC assessment of Plaintiff. He found no exertional, postural, manipulative, or visual limitations. Dr. Vincent noted that Plaintiff's hearing was limited, and that he should avoid concentrated exposure to noise and hazards because his hearing presented a possible safety or production problem. (Tr. 177-84). This assessment was affirmed on November 29, 2005. (Tr. 174-76).

Plaintiff had a hearing aid evaluation on September 3, 2008. At the time of the evaluation, he was experiencing pain in his ears. He stated that he

communicated mainly through lip reading, but that he listens to music through large headphones with the volume on a loud setting. The evaluator found permanent profound sensorineural hearing loss in both hears. The test was conducted without hearing aids. In neither ear did Plaintiff report being able to understand speech at the audiometer's maximum output of 125 dB. The evaluators noted that "there are no stock aids appropriate for his hearing loss as his loss is too profound." (Tr. 210-12).

## III.   Hearing Testimony

The ALJ held two hearings in this matter; Plaintiff was represented by his current attorney at each. (Tr. 213-49). At the first, on July 9, 2009, Plaintiff was not wearing hearing aids, as he had not had any since his old pair broke in 2001 or 2002, and could not hear the ALJ's questions through the videoconference system.[1] Plaintiff stated that, on the video monitor, he could tell that the ALJ was speaking, but he could not understand her. In addition, his hearing had not been tested since 2005. The ALJ therefore continued the first hearing until September 15, 2008 to allow Plaintiff time to attempt to obtain new hearing aids for free from the Department of Rehabilitation Services ("DORS"), and then to have his hearing re-tested with the new aids. At the second hearing, Plaintiff still did not have hearing aids, but was using a cell phone to hear what the ALJ said. He held the phone to his left ear, which is his worse ear, as he had an earache in his right ear.

---

[1]    Plaintiff and his attorney were in Davenport, Iowa for the hearings, and the ALJ was in Peoria, Illinois; they used a videoconference system to conduct the hearings.

Plaintiff, who was 29 years old on the date of the hearing, testified that he lived in his grandmother's home with his girlfriend and new baby.  He did not have any source of income other than his girlfriend.  Plaintiff had completed tenth grade, and did not have a GED; he could read and write.  During the day, he watched television with closed captioning, spent time with the baby, went for walks, and went to the doctor for the baby if necessary.  He took out the trash, swept the floors, did laundry, did some cooking, did some grocery shopping, and took care of his grandmother's flower bed; he could bathe and dress himself.  Plaintiff sometimes read newspapers or magazines, and played pool and went bowling; he played pool three or four times a week, and in 2007 he went to Las Vegas with his pool team to compete in a pool tournament.  He did not belong to any groups or organizations, and spent time with friends and family, though he testified that it was very difficult.  Plaintiff did not have a driver's license.  Plaintiff testified that he communicated with his girlfriend and others by text messaging or reading lips.

Plaintiff last worked through Sedona Temporary Service in May or June of 2008, in a warehouse job; he had worked on and off for about five months, going as long as three weeks between stints, though he had previously worked for Sedona since 2002.  His job was to lift boxes from a pallet onto a table so that other workers could sort their contents.  He worked 20 or fewer hours per week; it was supposed to be full-time, but the company did not have enough work for him to do.  Plaintiff left this job because he was frustrated with not being able to hear.

Plaintiff testified that the only problem he had with working was that he couldn't hear, which frustrated him.  He did not wear hearing aids as he could not afford them.  When asked by the ALJ, Plaintiff testified that he did not go to DORS to obtain new hearing aids for free because he "forgot all about it."  Plaintiff was not currently seeing a psychologist, psychiatrist, or counselor, and testified that he was not aware of having any mental health problems.

Impartial vocational expert George Paprocki was present at the hearing.  In response to questioning by the ALJ, he testified that an individual with no past relevant work and no exertional limitations, who would be limited to jobs with no climbing of ladders, ropes, or scaffolds, no working at unprotected heights or around unprotected hazardous machinery, and not requiring good hearing or working with the public, could work as a laundry worker or car washer.  Neither of these jobs would require any need for communication of any significance with co-workers or the public.  There would be 9400 Illinois and 110,000 national laundry-worker jobs, and 8000 regional and 250,000 national car-washer jobs.

Plaintiff's attorney objected to the questioning of the vocational expert, arguing that Plaintiff met the criteria for one of the Listings and was automatically disabled, and that it was thus improper to consider whether there were jobs available that he could perform.[2]  Without waiving this objection, Plaintiff's attorney asked the vocational expert whether these jobs could be performed if the

---

[2]     As the ALJ explained in her opinion, it was not improper to take testimony from the vocational expert, even where the attorney believes that a Listing has been met, as, if the Listing is not found to have been met, it will be to the claimant's advantage to have vocational expert testimony, which might reveal that the claimant is unable to perform any work and is disabled.

limitation was added that the worker "can only hear very loud, shouted speech at very close range.  He has no ability to understand what he hears."  The vocational expert testified that these jobs do not "require communication to perform the actual task," though some communication would be required to talk with a supervisor.  He stated that these jobs would "basically" not require an individual to be able to hear at all or understand anything.  Communication was "not present as a factor." Plaintiff testified that he had previously worked at a car wash, and had a problem with hearing the cars, as well as hearing orders regarding what to do with the cars. He testified that he was "scared to death to walk where there is anything to do with vehicles moving."

The ALJ then asked the vocational expert whether there were other jobs that a person so described could perform.  He testified that the individual could work as a small parts assembler or a plumbing hardware assembler, neither of which job would require communication with co-workers in order to perform the job; there were about 40,000 such jobs in Illinois and 500,000 in the national economy.  The vocational expert testified that his testimony was consistent with the information in the Dictionary of Occupational Titles.

## IV.    ALJ's Decision

The ALJ issued her decision on September 22, 2008.  (Tr. 7-25).  After reviewing the applicable legal standard for her decision, the ALJ found at Step One that Plaintiff had not engaged in substantial gainful activity since his application date.  At Step Two, the ALJ found that Plaintiff had the severe impairment of

bilateral sensorineural hearing loss.  She found that the evidence failed to establish that Plaintiff had any severe medically determinable mental impairment.  In so finding, the ALJ noted Plaintiff's testimony that he had no known mental problems, and that his only work-related problem was his hearing loss.  She also reviewed Plaintiff's medical history relating to his mental health.  First, she noted the September 18, 2003 examination, at which the Plaintiff reported a past medical history of ADHD and a current ear infection.  Then she discussed the August 3, 2005 mental status evaluation, at which he did not report either ADHD or mood swings; he attributed his frustration with people to their not being able to hear him. The doctor diagnosed only hearing loss.  Further, on August 18, 2005, a state agency consultant found that Plaintiff had no medically determinable mental impairment.  In addition, Plaintiff had not mentioned a mental impairment on his disability paperwork, and his attorney had claimed only hearing loss in a pre-hearing letter.

The ALJ next compared Plaintiff's impairment to Listing 2.08, which covers hearing impairments that are not restorable by a hearing aid; tests for the Listing are to be conducted with hearing aids in order to reveal whether the claimant's hearing meets the Listing even with the aids.  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 2.08.  She found that Plaintiff had not presented credible evidence establishing that Listing 2.08 was met or medically equaled.  The ALJ first reviewed Plaintiff's hearing tests from 2000 and 2004, both of which showed that Plaintiff did not meet the criteria of the Listing.  She found that, though the 2005

test appeared to meet the criteria, it was performed with old hearing aids, which the evaluator recommended replacing, and therefore did not establish the existence of a Listing-level impairment.  Finally, the ALJ rejected the reliability of the 2008 testing, which was performed without any hearing aids at all, and therefore did not reveal whether Plaintiff's *aided* hearing met the Listing.  Her rejection of the 2008 testing was also supported by her observation of Plaintiff's hearing abilities at the hearing, where he used only an off-the-shelf cell phone to assist his hearing.  The ALJ further relied on her observation that Plaintiff "appear[ed] motivated to present his hearing problem as more severe than is credible," because he had failed to attempt to obtain hearing aids from DORS in preparation for the 2008 test; the ALJ concluded that Plaintiff may have "put forth less than full effort during the testing" in order to exaggerate his hearing loss.

At Step Four, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, with the following limitations: no climbing of ladders, ropes, or scaffolds; no work at unprotected heights or around unprotected hazardous machinery; and no jobs requiring good hearing or work with the public. She first found that Plaintiff's medically determinable hearing impairment could reasonably be expected to produce symptoms of hearing loss, but that Plaintiff's claims regarding the intensity, persistence, and limiting effects of the hearing loss were not credible to the extent they were inconsistent with the RFC assessment. The ALJ thoroughly reviewed Plaintiff's hearing testimony and medical records, again noting her reasons for finding that the 2008 hearing test results were not

credible.  She agreed with the 2005 state agency assessment that Plaintiff's hearing impairment did not limit his exertional abilities, especially given his daily activities and his work earlier in the year at the light to medium level.  She added the nonexertional limitations in order to protect Plaintiff's safety.  The ALJ concluded that Plaintiff had failed to meet his burden of establishing that the hearing impairment was disabling.

Next, the ALJ noted that Plaintiff had no past relevant work, was a younger individual, had a limited education, and was able to communicate in English, and that transferability of job skills was not an issue as he had no past relevant work. Based on her findings and the vocational expert's testimony, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform.  She noted that Plaintiff's ability to work at all exertional levels was compromised by his nonexertional limitations, so the vocational expert's testimony was needed to explain whether there were still sufficient jobs that he could perform, given his age, education, work experience, and RFC.  She noted that the vocational expert had testified that a person of Plaintiff's age, education, work experience, and RFC could perform the jobs of laundry worker, car washer, or production assembler, none of which required the ability to hear.  The ALJ also recounted Plaintiff's attorney's hypothetical to the vocational expert that Plaintiff could "hear only very loud shouted speech at very close range and he has no ability to understand what he hears," to which the vocational expert had responded to the jobs could still be performed; the ALJ noted that this hypothetical was not

supported by the evidence.  She also took into consideration Plaintiff's stated fear of working around moving vehicles, finding that, even if the car washer job were eliminated, there were still sufficient other jobs in the economy to require a finding that Plaintiff was not disabled.  The ALJ thus concluded that Plaintiff was not disabled.

### DISCUSSION

Plaintiff claims that the ALJ erred in three ways in coming to the conclusion that Plaintiff is not disabled: (1) the ALJ should have found that Plaintiff's hearing loss met the requirements of Listing 2.08, (2) she erred in her assessment of Plaintiff's hearing loss in determining Plaintiff's RFC, and (3) she erred in not including Plaintiff's claimed mental impairments as severe impairments.[3]

## I.   Listing 2.08

Plaintiff claims that he has met the requirements of Listing 2.08 since 2005.  Listing 2.08 requires a hearing impairment, which is not restorable by a hearing aid,

---

[3]     Plaintiff also claims that the vocational expert's testimony, on which the ALJ relied, was not reliable, as it was based on the ALJ's allegedly erroneous finding that Plaintiff's hearing impairment did not meet the requirements of Listing 2.08. He presents no independent reason to believe that the vocational expert's testimony was not reliable.  As this is merely a rehash of Plaintiff's first argument, there is no need to discuss it separately.

He also makes an argument that the vocational expert cannot be assumed to have known of Plaintiff's "other limitations" when testifying.  (Pltf's Mem. at 16-17). As the hypothetical posed by the ALJ included all the limitations subsequently included in the RFC in her opinion, it is unknown to what "other limitations" Plaintiff refers.  (Tr. 243).  It may be that he is arguing that the vocational expert did not know of his age, limited education, and lack of past relevant work, but this is also unavailing, as the ALJ specifically informed the vocational expert of these facts when questioning him.  (Tr. 242).

> manifested by: (A) Average hearing threshold sensitivity for air conduction of 90 decibels or greater and for bone conduction to corresponding maximal levels, in the better ear, determined by the simple average of hearing threshold levels at 500, 1000 and 2000 Hz. (see 2.00B1); or (B) Speech discrimination scores of 40 percent or less in the better ear.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 2.08.  Plaintiff relies on the August 15, 2005 and September 3, 2008 hearing tests.[4]  The Court notes that it is Plaintiff's burden to show that his impairment meets or equals the requirements of a Listing.  *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (*citing Maggard*, 167 F.3d at 380).  In addition, under 20 C.F.R. §§ 404.1526(e) and 416.926(e), the question of whether a Listing is met or equaled is a legal issue reserved to the ALJ.

As noted above, at the August 15, 2005 testing, Plaintiff's aided speech detection threshold was 70 dB, and his aided speech discrimination score at 50 dB was 10%.  (Tr. 170-71).  On its face, this test would seem to show that Plaintiff met the requirements of part (B) of the Listing, as his aided speech discrimination score was only 10%.  However, as explained by the ALJ, the examiner noted that the hearing aids Plaintiff had at the time did not do him much good, and recommended that Plaintiff get new hearing aids.  The ALJ therefore determined that this test, which was not performed with properly functioning hearing aids, did not satisfy Plaintiff's burden to show that he met or equaled Listing 2.08.  The Court finds that

---

[4]     Plaintiff puts the date of this latter test at September 10, 2008, which is actually the date of the letter summarizing the test results from the evaluators. The test itself was performed on September 3, 2008.  (Tr. 210).

this is a reasonable conclusion on the legal issue of whether Plaintiff met or equaled the Listing, which is supported by substantial evidence.[5]

Plaintiff also argues that the September 3, 2008 hearing test showed him to have met the criteria of Listing 2.08. This test was performed without hearing aids, and resulted in a speech reception threshold of 100 dB and a 0% speech discrimination score for his right ear; the left ear was worse. In addition, the evaluators stated that there were no "stock aids" that would benefit Plaintiff. (Tr. 210). The ALJ rejected this test's reliability on several bases: (1) her observation of Plaintiff at the hearing, (2) the test was conducted without hearing aids, and (3) Plaintiff appeared to be exaggerating his hearing loss in order to receive benefits. The Court finds that the ALJ's conclusion was supported by substantial evidence.

First, the ALJ observed that, at the hearing, Plaintiff was able to hear her via an ordinary cell phone held up to his worse ear. She noted that she "spoke in a louder than normal voice, but did not shout, and the claimant was able to hear and understand the ALJ generally well, only occasionally needing to ask for questions to be repeated." (Tr. 15). This indicated to her that the September 3, 2008 evaluators' statement that Plaintiff could not hear or understand anything was erroneous; he in

---

[5]     Following this testing, on September 12, 2005, a state agency medical consultant assessed Plaintiff's physical RFC, and found that Plaintiff had no exertional, postural, manipulative, or visual limitations, but recommended that he avoid concentrated exposure to noise and hazards because his hearing presented a possible safety or production problem; he did not find that Plaintiff met or equaled any Listing. (Tr. 177-84). This assessment was affirmed on November 29, 2005. (Tr. 174-76). The Court finds that this evaluation lends even more weight to the substantial evidence relied on by the ALJ in rejecting the results of the August 15, 2005 testing. *See* Social Security Ruling 96-6p (state agency medical consultants "experts in the Social Security disability programs").

fact could hear and understand, with the aid of only a cell phone, which is not designed specifically to aid a hearing impaired person. Plaintiff argues that the ALJ's reasoning on this point is faulty, as Plaintiff was merely reading lips, rather than hearing what was said to him. While this may have been true for Plaintiff's attorney, who was in the room with him, it does not explain how Plaintiff was able to understand the ALJ if he could not hear her through the phone; he testified at the initial hearing that he could not, through the videoconferencing system, read the ALJ's lips well enough to understand what she said - he could only tell that she was speaking.[6] (Tr. 216, 218, 222).

Second, the September 3, 2008 test was conducted without any attempt to use a hearing aid. Though Plaintiff was instructed at the initial hearing to attempt to obtain a hearing aid from DORS, he did not do so, as he "forgot" about it. Further, the evaluators did not attempt to provide Plaintiff a hearing aid to use for the test. Therefore, the test did not prove that Plaintiff met the Listing requirements *even with* hearing aids. Plaintiff now argues that this conclusion was in error: since the evaluators had stated that no aid would improve his hearing, it would have been

---

[6]     Plaintiff said "I can read her lips," but then immediately stated "I know she's talking, but I can't understand what she's saying." (Tr. 218). Later, Plaintiff's attorney asked if sitting nearer the video monitor would help him to read the ALJ's lips, but Plaintiff stated that at home, even sitting very near the television was not sufficient to allow him to read lips. (Tr. 222). Indeed, the Court wonders why Plaintiff was holding the phone to his ear at all if he was relying solely on lip reading to communicate with the ALJ.

The ALJ also noted notes in the record indicating that Plaintiff could hear SSA staff without trouble when speaking on an ordinary telephone. (Tr. 16 (*citing* Tr. 184)).

"an entirely useless exercise for him to get hearing aids."[7]  (Pltf's Mem. at 15).  The ALJ found the examiners' statement that there was no hearing aid that would help Plaintiff was non-credible, in light of the facts that they did not test this assertion and that Plaintiff could use even an ordinary cell phone as an aid.   This determination was reasonable and supported by substantial evidence.   The September 3, 2008 test results were undermined by the fact that they were conducted without hearing aids.

Finally, the ALJ found that Plaintiff was likely exaggerating his hearing loss at the September 3, 2008 testing because of his pending claim for benefits.  Given his ability to hear via cell phone at the hearing and his failure to attempt to obtain free hearing aids from DORS for the September 3, 2008 testing as directed, the results of the September 3, 2008 testing, finding Plaintiff to be virtually deaf, were unreliable.  The evaluators "accepted at face value everything the claimant reported or failed to report, and identified no method used to determine the validity of the test results." (Tr. 16).  Hearing tests, by their nature, require honest and full effort from the patient, and it would be easy for a motivated individual to "fail" a hearing test.  The ALJ found that these facts, coupled with Plaintiff's understanding that if he performed poorly on the September 3, 2008 testing he would be more likely to get benefits, undermined the results of the testing, which was completely reliant on Plaintiff's reports of what he could hear.   The Court finds that these facts are

---

[7]     The Court notes the disingenuousness of this argument, as Plaintiff did not find out that the evaluators would say that no aid would help him until after he had decided not to attempt to obtain a new set of aids.

sufficient to support the ALJ's reasoning in discounting the September 3, 2008 testing.

The Court finds that these reasons constitute substantial evidence supporting the ALJ's finding that Plaintiff did not meet his burden of showing he had met or equaled the requirements of Listing 2.08 based on the September 3, 2008 testing. Plaintiff appears to misunderstand the burden placed on him in showing that a Listing is met - he seems to believe that the ALJ must find a hearing test showing that Plaintiff does *not* meet the Listing. On the contrary, when the burden of proof is on a particular party, the other party need not *disprove* the fact at issue; the ALJ did not need to have "medical evidence to rely on in determining that the criteria of the listing have not been met." (Pltf's Mem. at 14). The party with the burden must come forward with competent evidence proving the fact. If the party's evidence is not credible, then it has not met its burden, whether or not there is any contradictory evidence.[8]  Here, the ALJ articulated three substantial, logical reasons for finding that Plaintiff's evidence on this point was not credible.

---

[8]     These observations apply to both the first and second of the ALJ's reasons for rejecting the September 3, 2008 testing, as well as to her rejection of the August 15, 2005 testing. It was Plaintiff's burden to come forward with evidence that, even with hearing aids, his hearing was poor enough to meet or equal the Listing requirements. As Plaintiff showed at the hearing that he could hear with a simple, rudimentary aid (a cell phone), he undermined the evaluators' statements that he could not hear anything that was not shouted and that aids would not be helpful. Likewise, by failing to attempt to have his hearing tested in 2008 with hearing aids, he failed to put on evidence that he met the requirements of the Listing, which requires a certain level of hearing impairment *even with* aids. Proper evidence would have included a test with working hearing aids, or reliable evidence that aids would not be helpful.

## II.     The ALJ's assessment of Plaintiff's RFC as to hearing loss

Plaintiff complains that his RFC assessment states he cannot hold a job requiring "good hearing."  He claims that this indicates the ALJ's erroneous conclusion that Plaintiff "could hear up to but not including 'good hearing.'" (Pltf's Mem. at 18).  First, it must be noted that this RFC assessment in no way indicates the ALJ's determination that Plaintiff had something better than poor hearing. Plaintiff is playing a sophist's game in attempting to conflate a *limitation* on his RFC with a finding that he had some unspecified ability to hear "up to good hearing."  The ALJ's RFC assessment recognized that Plaintiff could not hold a job requiring him to hear well - it is not as though "good hearing" is equivalent to an "A" grade, and that she necessarily found that Plaintiff had "B"-level hearing when it is in fact "D"-level hearing.  "Good hearing" is not a term that is defined in the Social Security regulations.

Here, again, Plaintiff misunderstands his burden.  He appears to believe that the ALJ had to have medical evidence proving that Plaintiff had "up to good hearing."  On the contrary, he had to put on evidence showing that he did not have "good hearing," which he did, and which is why the ALJ put that limitation on his RFC.  As discussed above, the ALJ reasonably found that the hearing tests presented by Plaintiff failed to establish a Listing-level impairment, but it was apparent to her that Plaintiff had a severe hearing impairment.  Therefore, she limited Plaintiff to jobs that did not require fully functional hearing.

Furthermore, this "good hearing" distinction is even more meaningless, as the ALJ specifically elicited testimony from the vocational expert that the suggested jobs required essentially no hearing. Whatever is meant by "up to good hearing," it is clear from the vocational expert's testimony that there exist sufficient jobs Plaintiff can perform that do not require hearing as a "significant factor." (Tr. 244). Plaintiff's attorney suggested a hypothetical to the vocational expert including as a limitation that Plaintiff "can only hear very loud, shouted speech at very close range. He has no ability to understand what he hears." (Tr. 244). In response, the vocational expert testified that these jobs would still be available. Therefore, it is irrelevant which of the two limitations was actually included in the RFC, as Plaintiff would not be disabled with either limitation, though the Court notes that the ALJ's RFC assessment as given was supported by substantial evidence.

## III. The ALJ's finding that Plaintiff did not have a medically determinable mental impairment

Finally, Plaintiff argues that the ALJ's finding that he did not have a medically determinable mental impairment was not supported by substantial evidence. He claims that he has "medically documented problems with memory, judgment, and abstract thinking," which should have been included as a severe impairment and considered in relation to the RFC assessment. (Pltf.'s Mem. at 23). Plaintiff relies on the August 3, 2005 examination by Dr. Hauck, who did not diagnose a mental impairment, and who recommended medical treatment for Plaintiff's hearing loss. (Tr. 167-69). The ALJ determined that Plaintiff did not have a severe medically determinable mental impairment, citing to Plaintiff's

testimony that his only impairment was his hearing loss, the evaluation by Dr. Hauck, Plaintiff's attorney's statement that the only allegation of impairment was hearing loss, and August 18, 2005 state agency medical consultant's evaluation. (Tr. 12-13).   The ALJ's conclusion on this point was supported by substantial evidence.

First, the Court notes that the current claim of mental impairment is inconsistent with Plaintiff's own testimony and with representations made by his attorney prior to the hearing.   At the hearing, Plaintiff testified that his only problem with work is his hearing, which sometimes caused frustration - he did not mention or allude to any problems with memory, judgment, or abstract thinking, and in fact testified that he was not aware of any mental problems.   (Tr. 234-35). Further, Plaintiff's attorney stated in a letter to the ALJ prior to the hearing that his only severe medically determinable impairment was the hearing loss.   (Tr. 154). Though this is not alone dispositive, it does cast doubt on the effect of Plaintiff's alleged mental impairment on his ability to work.   If, prior to the ALJ's decision, neither Plaintiff nor his attorney thought that Plaintiff's currently-alleged mental problems impaired his ability to work, it renders the claim made now somewhat doubtful.

Further, the ALJ relied on the evaluations of two doctors, neither of whom opined that Plaintiff's alleged mental impairment was limiting or resulting from an "anatomical, physiological, or psychological abnormalit[y] which can be shown by medically acceptable clinical and laboratory diagnostic techniques."   20 C.F.R. §§

404.1508.   Though Dr. Hauck noted a number of difficulties Plaintiff had with certain mental tasks, he did not find that these were caused by or warranted a diagnosis of a particular anatomical, physiological, or psychological abnormality. (Tr. 167-69).  Further, Dr. Kirk, the state agency medical consultant, later reviewed Plaintiff's medical history (quoting from Dr. Hauck's evaluation), and found that Plaintiff had no medically determinable impairment.[9]  (Tr. 185, 197).  The ALJ cannot independently find that a claimant has a medically determinable severe impairment - she must have some medical evidence on which to rely.  20 C.F.R. §§ 404.1513(a) (must have evidence from acceptable medical sources to establish medically determinable impairment).  As the evidence in Plaintiff's records lacks any indication from a medical source that Plaintiff had a severe medically determinable impairment resulting from an "anatomical, physiological, or psychological abnormalit[y]" it was reasonable for the ALJ to concur in this judgment.  20 C.F.R. §§ 404.1508.

As the alleged mental impairment was properly found not to be a severe medically determinable impairment, it need not have been addressed in the RFC determination.  Social Security Ruling 96-8 ("The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms.").

---

[9]   Plaintiff's brief ignores Dr. Kirk's evaluation, which must be considered as an "expert" opinion of Plaintiff's abilities as they relate to the determination of disability.  20 C.F.R. § 404.1527(f)(2)(i); Social Security Ruling 96-6p.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 11) is DENIED and Defendant's Motion for Summary Affirmance (Doc. 13) is GRANTED.

CASE TERMINATED.


Entered this <u>17th</u> day of May, 2010.


                                      s/ Joe B. McDade
                                    JOE BILLY McDADE
                        United States Senior District Judge